Next case this morning is United States v. Rudolph, 23-1278. Counsel for appellant, if you'll make your appearance and proceed, please. Thank you, Your Honor. May it please the Court, my name is David Marcus, and along with Lauren Doyle Perez and Margot Moss, we represent Larry Rudolph in this matter. I'm going to attempt to reserve three minutes for rebuttal. This is no ordinary severance appeal. Not only was Mr. Rudolph denied the ability to call a crucial defense witness that would have undermined a supposed confession, but the jury was also subjected to testimony and argument that it would not have heard if Mr. Rudolph was tried on his own. Let me ask you a quick threshold question about that. I noticed in your briefing below that there was focus on the question of joinder, proper or not. I didn't get that same focus in your appellate brief. Are you zeroing in on the question of severance? Yes, Your Honor, we are. We're focused on severance. We don't believe that joinder was proper, but for purposes of the severance argument, we don't need to go there, and I don't think we need to engage in that debate. I will say that the four counts of perjury, the government almost conceded below that that was improperly joined, but I don't think we need to get there, Your Honor. Okay. So, the government's arguments at trial, they argued two primary things. First, that a bartender heard Larry Rudolph confess to Lori Milliron, and second, that Larry's motive of murder was that Lori Milliron gave Larry an ultimatum to leave his wife and that he did not want to divorce his wife. Without a severance, we couldn't combat the confession testimony. What about the limiting instruction? Right. So, the limiting instruction goes to the second area of these two witnesses that came in, Anders and Grimley, and the limiting instruction had nothing to do with the bartender part, the confession part. It was the second prong of the severance, that had Rudolph been tried separately, the jury wouldn't have heard these two witnesses, and the problem with the jury instruction, usually jury instructions, we presume they work, right, Judge? So, but in this case, they didn't for a number of reasons. One, the evidence was so intertwined. It was the motive evidence for the murder that would have been kept out. The Anders and Grimley testimony was the motive evidence. Second, the judge really showed disdain for the instruction when he was required to give it. First, he said, here we go again. Well, he said he was saying that in jest, I mean, he did observe and reflect to the jury that maybe that was not the best statement, but he did try to fix it. He did try to fix that one statement, but he also said on another occasion, I'm only giving this instruction because the government is not objecting to it. And so, he did show the jury that this instruction, that he had to repeat eight, I think eight or nine times, and, you know, anyone who's ever been in a trial court knows that when you have to repeat an instruction that many times, there's a problem. But the final point, and I think this is the most important point about the jury instruction issue, Your Honor, is that the government tried to capitalize on this testimony in its closing argument, in its rebuttal argument. It focused on the motive evidence that was only admissible as to Ms. Milliron. It focused on that with respect to Larry Rudolph. So, I can read some of the parts of that closing, which is in volume 19 at page 4930, 5012. For example, the government said, this is a case about the defendant's loss of control. It was about a man who was running out of ways to control his mistress, to get back control by murdering his wife. That is directly from the Grimley testimony that would not have come in at a separate trial. There's many more of those statements. For example, I'll give one more, but these are all in our reply brief. Milliron was asked about the affair, the money, the change in lifestyle after Bianca's death, the ultimatum, the confession. This is the key part. The government says, all key aspects to the case against Lawrence Rudolph. Talking about the Grimley and Anders testimony that would not have come in at a separate trial, the rebuttal closing, when we can't get back up, they're focused on, this is key evidence against Larry Rudolph. So, the judge could have instructed a hundred times. He gave eight instructions, but if the government's using that evidence in its rebuttal to try to make its case against Larry Rudolph, there's a big problem there. The instruction is not going to be effective. Why isn't there a problem about the sufficiency of the argument for severance below? I mean, we're talking about what would presumably be the after effects of the fact that there was a joint trial, but as recently as this morning, I revisited again the affidavit from Ms. Milliron, and there was not a lot to that. I will respond, I will reject these statements, and the statements weren't even mentioned that she was going to reject. So I just want to be very clear. What I was just reading from, Your Honor, and the argument and the instruction that Judge Rossman was asking about, that deals with the Anders and Grimley testimony that would not have come in. Not the affidavit. The affidavit deals with the bartender testimony. The testimony from the bartender about the supposed confession, there were two reasons for severance. I thought the affidavit went beyond the bartender testimony. You talked about additional, there were two people who the bartender, the affidavit related to. Correct, Your Honor. You're right, but the point that the government makes, which is an interesting one, is remember that if there were separate trials, the Anders testimony does not come in at a separate trial against Rudolph. So the affidavit does not need to undermine the Grimley testimony. It's not required because the government concedes below and on appeal that the Anders testimony would not have come in at a separate trial. As to the bartender testimony, and this is really important, everybody agrees to the surrounding facts, Chief Judge Holmes. So unlike a lot of the cases, like your case in Pursley that you wrote and some of the other ones, in this case the government agrees that Lori Milliron was in the bar, heard whatever was said, and was in the best position to hear what was said. Those facts are agreed to by the government. So the only question is, was her affidavit specific enough about contesting the confession on the bartender to satisfy the cases from the Tenth Circuit, McDonald and the other cases? And why is that a real issue? One. Two. The affidavit was conditional, which is another issue. When you read it, it essentially, it as much as says, if I'm tried first, once I'm acquitted, then I will testify in this trial. Why isn't that a problem? I'll address both. So yes, please. The first one is whether it's specific enough. And so to me, what we're talking about is two words that were left out of the affidavit, which is everybody agrees that Mr. Rudolph said the end part of the statement. The question is, what did he say at the beginning? And Rudolph and Milliron said that he says, they're saying I killed my wife for you. And so the bartender admits that he didn't hear the beginning part. The only question is, what are those two words and should those have been in the affidavit? And we offered the judge in our motion. Were there any words in the affidavit in terms of what the bartender would have said? Well, the bartender, everybody agrees that the bartender said he heard. No, no, no. That's not my question. My question is, in the affidavit, did she say, this is the testimony, this is the testimony that I will rebut. She said, and she said, I've read the discovery. The discovery says the bartender heard a confession and Larry Rudolph did not confess. And let me just add to that point because, again, this is really important. In our motion for severance, we offered, and she read it and agreed to it, to submit to an ex parte proceeding with Judge Martinez to explain any details that were needed. Why would that be necessary? I mean, why would the judge have to hear that? I mean, this is your shot. As in most litigation, you have your shot. Your shot is, here's the motion, I'm doing a severance motion, this is what I'm going to put forward to support the severance. Why would Judge Martinez need to have supplemental information provided? Why couldn't she be more specific about what she would say and what she would rebut? As I said, I read it this morning and there's not a whole lot of meat in that. Well, I think for a couple reasons. One is, you know, the defense, remember, has not heard the testimony of the bartender yet. We haven't been to trial. There's no depositions in a federal criminal case. All we had was a report that explained that Larry supposedly confessed at the bar. What the parties agreed to is that there's only one other person who heard it, Lori Milliron. She was in a better position to hear it and she said, no, there was no confession at the bar. I can testify to that. As to your point on conditional, and this is a point the government stresses in its brief about that it was a conditional, there is nothing in her affidavit that's conditional. What she says is, if the allegations and charges against me were tried separately from Larry's case, I would be able to testify at Larry's trial to correct Ms. Grimley's and the bartender's false misleading and confused recollections of what they think they heard me and or Larry say. I'm very sure the jury would believe me over those witnesses. And she goes on. The motion itself is conditional. So we filed a motion and we said the proper order, if you're going to grant the severance is to have her trial first. And you're saying we should ignore that? No, no. But the question from the cases, your honor, is whether her proposed testimony was conditional. It was not. Well, the district court made a finding that her willingness to testify was predicated on her being tried first. And that was wrong. I mean, that was wrong, your honor. It was not. I mean, she does not say. Well, wrong's not good enough. I mean, it would have to be clear error. And the clear error talks about the notion of, is there no plausible basis in the record? Well, there is a plausible basis in the record. I mean, the way that affidavit, no, the affidavit doesn't speak conditionally. But the person who's in the position to propound the severance says that's what we should view this as being, which is Mr. Rudolph. We, we in our motion say if the severance is granted, this is the proper order, which by the way, your honor, it is the proper order. That's not the question. I mean, no, I understand. I understand. The question is, was her testimony offered as a conditional testimony? It was not. Her affidavit is not conditional. The lawyers say here, your honor, is the proper procedure for how to go forward. And, and the judge took our proper procedure legal position as her factual affidavit being conditional way. But she uses the language of conditionality in the last paragraph of her, of her affidavit. And so if that were not there, I would agree with you that she would say, I would be able to testify at Larry's trial, et cetera, but she conditions this. And it seems that we're constrained by our case McConnell that suggests, or I think more than suggests that any type of conditionality, uh, cuts against your position. Well, I just want to make sure I understand. So if, is your honor's position that when she says I would be able to testify, that's conditional. Cause if, if that's the case, I don't know if the allegations and charges against me were tried separately from Larry's case, I would be able to testify on so forth. So there's, there's some condition in, in terms of how she's understanding when she would be available, when she would testify. Oh, no, I disagree. So all she's saying there is if, if we're tried together, I can't testify. And if we're tried separately, I will testify. I can testify if, if I'm subpoenaed, I would, I would testify. And so there's no condition there, McConnell and all the other cases all talk about, yes, if the cases are tried together, there's, she can invoke her fifth and if they're tried separately, no. So that is not a condition under McConnell and personally in the other cases also talk about what counsel represents on behalf of the witness. And here you represented in your severance motion that once Lori speedy trial puts these trumped up charges behind her, she will again have nothing to fear from testifying. And you specifically said her trial should come first. The case law that you cite would indicate that the district court was perfectly appropriate and correct in considering what you said should happen. She should be tried first and then she can testify. And then you've got her conditional language in paragraph nine going right along with that. How was that error? How was that clear error on the part of the district court? Right. I don't, well, two things. One, I don't think paragraph nine is conditional, but, but for as to what, let's say we disagree. Yeah. Yeah. As to, as to what is in the motion again, I think, I mean, I think we've, we've laid out our position on this, your honor, which is what is in our motion is not conditional for her and it is the proper procedure for how it should proceed. So I see my time's running. I really wanted to hit these other issues. I will say a couple of points about the other issues. One is on the Olmstead hearsay. The only thing I'll say about that is the parties agree. They made a lot of waiver arguments, but the parties agree that the, the key statement, the ultimatum statement was not waived below or on appeal. So that should have been excluded under 804 B six on the venue issue. All I'll say is it just can't be the law that first brought means someone living in the United States for five years. The government knows where he is and then lets him leave and then brings him to Denver. That can't be what was meant by the venue statute. And finally on the forfeiture point is that the government raises this new argument derived from on appeal, but the statute says derived from proceeds traceable to an offense. And here they were not able to show anything traced to the event. Let me ask you this question. If you prevail on your forfeiture argument, do you agree that the correct outcome would be a remand for under the substantive substitute property provision for the specific amount of the insurance policy? Yes, sir. Okay. And, and I'll give you a little time and rebuttal. So think about it. Uh, thank you. I will.  Mr Bruel. Please. The court. Bishop Bruel on behalf of the United States. I want to correct a couple of things about the record. First of all, the judge only made that comment once in front of the jury. The second comment was at a sidebar. The jury did not give a comment about if it wasn't for the government's objection, I wouldn't give the instruction. Secondly, when he's talking about the closing arguments, uh, the one at 4930 where the government saying this is key aspect of the case against Lawrence Rudolph. It's very clear if you read that, that isn't talking about the materiality for her perjury charges. The government made clear we're turning to Lori. Now let's talk about her perjury charges. Materiality is an, is an issue and that's the only place it says, and those were key aspects of the case against him. And so it was talking about the materiality. It was not talking about trying to make the case against him regarding his charges. Uh, 5012, uh, losing control, uh, that is based on her getting her own bank account for the first time that was in the record. And also the statements to Olmstead that, uh, she was going to confront him and ask him to fire his wife or fire, fire his mistress and, and the affair, uh, it was not necessarily based on Anders or Grimley or any of that testimony. Um, the defendants were obviously, uh, properly joined and accessory is always properly joined with the offense, uh, that they were an accessory to. But proper joinder is not a response to severance, right? Correct. And, and, but once, once we have joined her, the burden is extremely high and they have to make a strong showing of prejudice that requires them both to show, um, that there's actual prejudice outweighing the expense and inconvenience of the two trials and that less drastic means such as three insertions in the light could not cure that precious. And here the expense was sky high. We had 30 domestic and international witnesses, a three week trial. This was during COVID. Uh, it simply didn't make sense to have two separate trials to prove the exact same murder. Um, I, I, um, appreciate the, the judicial economy argument. I think it's, um, prevalent in almost every case, but it's especially prevalent here. My trouble here is, um, I'm trying to understand whether the district court, when it was originally considering the motion to sever and dropped a footnote that, uh, said that when, uh, that it seemed to me that it was suggesting, well, that the antidote to this problem is Mr. Rudolph can, can just testify. And that suggested to me that the district court was, um, operating under the assumption that constitutional rights are fungible and exchangeable, um, and that Mr. Rudolph, uh, can exchange his fifth amendment right for his right to present complete defense. So I wanted to get the government's position on that. And I have two questions. Do you agree with my reading of that, that informed the district court's decision? It dropped a footnote. So do you agree with my reading of the record? And then if you do agree with my reading of the record, why isn't that reversible error? So I don't think I agree with your reading the record. There is the footnote that is correct, but I think it's quite clear that that was just an aside. It was not at all the basis for the district court's ruling. I think the district court was talking all about the value of Ms. Milliron's testimony, the expense and inconvenience of the impeachment that would be against her, the conditional offer. It was all those factors that are ordinarily considered. Um, second, I think I, I'm unaware of any case law that says that, uh, the court couldn't make that a basis. And what I would suggest is defendants are often forced to make hard choices between things. But even if it were, um, even if it were error, and even if that was the basis for the ruling, uh, I think it would be harmless for all of the reasons that, again, there was none of the, um, if you leave that aside, the defendants still shouldn't have been severed because of the fact that they didn't show the prejudice required from her testimony because the limiting instruction is going to fix all of this. And so I, I think those would be my three responses to that particular point. Um, the court has already talked about the conditional nature of their motion, suggest she has to, she's going to be tried first. The affidavit itself, uh, suggests that it's conditional whether she would testify at all. And that's what the district court found when it said she would be able to, not that she necessarily would. Um, and then the allegations that what she offered was vague and conclusory. She didn't even say he, uh, the bartender here is going to testify that there was confession and I would testify that there wasn't. She didn't even offer that. Um, she had to offer some details, but even if she had offered details and said, well, she did say that the alleged conversation flatly contradicts and is entirely inconsistent with what Ms. Grimley and the bartender claim. It's just a conclusory allegation. I'm going to say something different than what they say. And she doesn't even, she doesn't provide what that's going to be. I think that's insufficient, Your Honor. Um, but even if she had given detail, say that she had said in her affidavit case laws of sports, some, this much detail isn't sufficient. She's got to say exactly how her testimony would have been inconsistent. Yeah, I, I believe the, um, uh, I think it's the personally case that we cite. I think we point out in our brief how the allegations there were even stronger in this court found that, uh, that, that was not enough. Um, but even if she was going to say, yeah, the bartender said that he heard that Mr. Rudolph killed his wife for her, but actually we're talking about this FBI investigation. Uh, that still wouldn't have swayed the severance calculus here because there was mountains of impeachment against her and she had serious credibility problems from her financial and intimate ties with Mr. Rudolph, indeed her dependency on Mr. Rudolph for her finances. Uh, as this court said in Persley, if the codependent's proposed testimony lacks sufficient exculpatory, uh, content or has serious credibility problems, severance is generally not going to be required. Uh, and finally, uh, had she said that she would have been, um, that would've been contradictory to Mark Swanepoel's testimony that he didn't actually tell Rudolph about the investigation, which is who Rudolph said he found out about this from until the summer of 2020 when Rudolph's son was reached out to by the FBI and Rudolph reached out to him. That was after this pre COVID confession. Um, so I, I just don't think, uh, there should have been a severance based on her testimony When it comes to Grimley, both in terms of response to Milliron offering response to Grimley's testimony and Grimley's testimony coming in, um, we had the limiting instructions, so that, uh, made it harmless. Also, the jury didn't believe Anna Grimley. Count eight was fully based entirely on Anna Grimley's testimony about the ultimatum and the jury acquitted. But when the district court was originally making the decision to sever, he didn't know that. No, he didn't. But that goes to the harmlessness, uh, your honor. And so that's still something that you would consider in the harmlessness analysis, uh, under this court's precedence, um, for furthermore, uh, even without the Lori Milliron ultimatum, you had the Bianca Rudolph ultimatum, and that put him in the same position when it came to this litigation and the fact that a divorce needed to be occurring. With respect to Rachel Anders, again, the instruction was given throughout, um, plus much of the, um, much of the evidence from Rachel Anders was actually admissible against him. Um, much of her testimony was based not on statements, but based on her own knowledge. For instance, when she talked about Rudolph paying for her and Ms. Milliron's son to go to Cabo San Lucas, that wasn't based on a statement, that was based on her own information. Um, and then when there were statements, some of those were admissible because they weren't actually hearsay. For instance, when she, Ms., um, Milliron called, told Mr. Rudolph, uh, called Mrs. Rudolph an ugly Italian B-word, that wasn't being offered to prove the truth of the insult, it was being offered to show that Ms. Milliron was jealous. And that evidence was, um, cumulative to a lot of evidence in their emails. The emails between Rudolph and Milliron showed that he was paying for these trips for his kid, her kids, and they showed that she was jealous, um, of his wife. Uh, I want to ask about the, uh, Bianca's testament, well, statement to Ms. Olmstead. Uh, those statements, uh, specifically the question of the post-nuptial agreement. Is it the government's theory of trying to, with the statements about how he knew how to do her name and that kind of thing, is the implication that he forged that agreement? I mean, what, what was the government's theory related to that evidence? Yes, the government's theory was that he had forged the signature on the post-nuptial agreement, but we did also then explain, uh, throughout argument that even if he hadn't forged that, even if her signature was valid, that there were all kinds of reasons to think the post-nuptial itself would not be enforceable under Arizona law. And then besides that, we pointed out, even if the post-nuptial was valid, he still had tons of motives to kill his wife because he still was going to have to pay her two million under the post-nuptial. He was still getting 4.8 million from the life insurance. He still was in this position where either his wife or Ms. Milliron was likely to blow up his Safari Club International litigation. So there were all kinds of reasons, and show that he had lied in federal court. So there were all sorts of reasons to kill his wife regardless of that. But that was the theory of those particular statements. Well, how does that square with the fact that, uh, that Bianca in that series of statements also says she signed something? I mean, she specifically says that she was at the table and he basically had me sign something, which she worried about later, which was in effect the post-nuptial agreement, right? I believe she said that, uh, he tried to force her to sign something. I don't believe she says that she actually ended up signing it. He signed something. She says that he signed something in her name. That's what she told Olmstead. I'm not sure that's correct or not. Huh. Okay. Um, and there was also, uh, a yellow note. So there's, um, a yellow note paper that's signed that looks like this, uh, pre post-nuptial agreement. And then there's the post-nuptial agreement. So there's, there was also more in the document, but regardless, um, those statements were properly admitted, um, and they were harmless even if they weren't properly admitted because of the other, the other motive evidence, I think. And, and the, the properly admitted related to the anticipatory notion that there would be a divorce proceeding that hadn't even taken place yet. That's correct. But the Supreme Court in Giles even talks about, um, somebody stopping somebody from making a domestic abuse report, uh, again, implying that there's not actual litigation ongoing, but that that particular, that that again would stop something from proceeding. So I think that that's a recognition from the Supreme Court that that's appropriate. Um, and then the Dehinza case from the second circuit also says that we don't want to wait until there's litigation ongoing for these because that actually somewhat gives you an incentive to kill somebody before the litigation gets going. Um, and so it's creating these perverse incentives. So that's, I don't believe required that there's actually a proceeding ongoing for the 453. How is the 804 B6 standard satisfied with respect to the statements that the government contends were going to blow up the defamation proceeding? Um, so you mean statements five and six that we're hearing for the safari club international litigation? Yeah. Um, so the evidence, uh, that for one thing, um, the court could consider, uh, well, court can consider on, um, Ms. Rudolph statements herself under Bouchelet. So that's something that certainly sufficed to satisfy the spark of international litigation. Um, and then the other evidence was that, um, oh, sorry. We also had the, uh, the statements that would not be under 804 B6, Ms. Rudolph's statements that were Hillman future intent statements that said she was going to confront Rudolph about, um, uh, about this. And so that proved it. And then his own testimony also proved that Bianca Rudolph had in fact lied in her deposition. Uh, she said that she was unaware of the affair with, um, Ms. Milliron. He says in his testimony that she was aware of it. So that showed that she had lied about it. And when you have that timing from the Hillman statement that she was going to confront him and ask for the divorce, and then you time that with the fact that in July, he actually doesn't end the things with Milliron, he goes on a, uh, a plane trip with her and orders the propofol. Um, all of that timing and that evidence, I think suggests that that could blow up as far as international litigation. I thought the inquiry under 804 B6 was much more discreet, right? So that you have to show by preponderance, some evidence supporting an intent to prevent her from retestifying at the definition. She testified favorably for Mr. Rudolph. So, so I just want to make sure that I'm isolating the legal inquiry correctly and applying it to the correct fact. The legal inquiry seems to be focused on an intent, right? To prevent her from retestifying. And the facts are that she testified favorably, but there was some evidence that you, that the government needed to show by preponderance that she was going to recant. Is that correct? I think that we did have to show that she was going to recant. And I think again, that was the fact that she gives the deposition in July, um, she has told him, leave Lori Milliron or, uh, I'm going to divorce you. And the fact that he doesn't leave Lori Milliron suggests that perhaps she doesn't know that he's still with Lori Milliron. But at some point, she, he's still going to have to make that choice between the two of them. And as long as the litigation is still ongoing, he's in that pickle that she could recant. And so I think that that was enough for the court to find that in fact, that was another of the reasons that he, um, that he killed his wife. And what's your harmless error argument if we don't buy that? Uh, this would just be for statements five and six. Yes. So first of all, statement six, they didn't raise an open brief. I think it's waived. Uh, but statement, um, so statement five, is she confirmed to him about his affair and he denied it until confronted with Milliron emails. That is basically the same thing as the stuff that came in under Hillman, uh, the fact that she said she was going to do that. I think that, um, is effectively cumulative. Uh, the fact that she said she was going to do it, the jury could infer that she was going to do it and likely would infer that. And so that statement is basically cumulative. And then his second statement, uh, the one that I think is waived, he agreed to fire Milliron and break off the affair. Uh, I just don't see how that particular statement in light of everything else that came in the trial, the forensic evidence, um, the other statements that were waived, the, uh, Lovelace statement, any of that, how that would have changed the result on either the wire fraud or the murder conviction. I see I'm out of time. Unless the court has further questions, I would see, uh, sit down. No, thank you. Counsel. One minute. Thank you. Let me just start, if I may, um, with what, how my, my brother just ended, which is we preserved the ultimatum point on Ms. Olmstead, a statement six, that's the whole basis of our initial brief and our rebuttal and the government theory that, um, somehow this post nuptial was forged. Their own experts said it wasn't forged and the court was right when it asked, didn't a Bianca Rudolph say that she signed it? Yes, she did. In a handwritten note, which is at volume 18, page 45, 14 and volume 20 at page 5092. She admitted signing that post nuptial and the government experts said that she signed it. Um, there was no divorce proceeding pending. There was no hypothetical divorce proceeding. There's no evidence that he killed her to prevent her from testifying in a divorce or from changing her testimony at the safari club. There's just no evidence of that. It's all speculation and under 804 B six, that's just not enough. This was the ultimatum supposedly made by his wife. It was the critical testimony. I'm not sure how it could ever be harmless that the decedent statement about an ultimatum that was the government's case. It was the testimony in rebuttal that the government said, this is the most important testimony. So this is, we believe in Larry Rudolph and I'm so thankful that you had us argue here today and we asked for the case to be reversed. Thank you so much. Thank you for refining arguments, counsel.